If it may please the court, Stuart Grouse on behalf of plaintiffs, Paskenta Band of Nomalaki Indians and Paskenta Enterprises Corporation. I'd like to reserve five minutes for rebuttal. All right, counsel, please be reminded that the time shown is your total time. Understood, your honor. Thank you very much. If it was alleged that the city of San Francisco's retirement service providers actively assisted one member of San Francisco's Board of Supervisors and four unelected officials in setting up and administering a city-funded pension for just those five people that in three and a half years transferred four million dollars of the city's that at least a plausible breach of reasonable care by those service providers if not knowing Mr. Grouse, can you stop for a second? We're getting some feedback here. Judge Kleinfeld, is that from your end? Everything's fine here. I think I hear you turning your pages, but maybe I'm wrong. Oh, let me move my microphone further away. If you want to mute who's not talking, I'll do that too. All right, thank you, your honors. Appreciate it. As I was saying, the same is true. The same hypothetical. If in the face of press reports, if the trustees, if in the face of press reports that the trustees of the city's 401k plan, the San Francisco's 401k plan, have been accused of embezzlement and fired from their positions and the city's retirement service providers sat for two months on paperwork submitted to the city to change the trustees on the plan and right before making the plan, the change, made sure that they assisted the should-be former trustees liquidating all accounts in the plan. Again, it would be absolutely, at the very least, plausibly alleged that those service providers violated a duty of care to the city or plausibly to that they knowingly provided assistance to those officials in abusing their between the hypothetical city and the hypothetical plan manager or administrator? Your honor, in order to determine whether they had breached a reasonable, a duty of reasonable care, I would submit no, because what we're talking about are affirmative actions. So what we're talking about here are affirmative actions that were taken by APC and Moore to both set up a pension plan that had its obvious purpose and effect, the transfer of money very quickly from the tribal government to these five officials. But counsel, under that scenario, what would be what would be the source of the duty? The source of the duty is a reasonable competence that a retirement service provider has. So when a retirement service provider is engaged in, is hired by a government and that retirement service provider then is providing services to that government, there is a basic duty of reasonable care that they need to comply with. Mr. Gross, can I let me let me ask questions because and I want to separate for a moment the design of the plan from the termination for a second. Is there anything illegal about the plan that was designed facially? So was it facially illegal? No, no, it was not. Okay, is there anything anything in the plan that was designed that doesn't correspond with the IRS regs? Typically, one designs these plans to make them tax deferred. Is there any any problem in that end? Well, what there's a problem with in that end, your honor, is how quickly it was. It was terminated. But the problem here, your honor, I see what before you please focus on the questions I'm asking. It seems to me that if an organization comes to somebody whose job is simply to design a plan and says here's how we would like the plan designed and what it asks is facially legal, does the service provider then have a duty in your view to go past the authorized representatives of the organization back to somebody else and say, wait a minute, your president and CEO or somebody came to me with all the appropriate authority and asked me to design a perfectly legal plan. But I just want to make sure there's no fraud going on. Is that your position? Well, my position is not quite that, your honor, because I think what's important here is this is not a company with a president and CEO. This is a governmental institution. And on its face, this pension was inappropriate. When you see you keep saying inappropriate, but I'm having that's why I asked whether it was illegal. Could could could non crooks come to a pension plan and ask for this kind of program to be designed for for a government for a governmental entity? No, it would it makes absolutely no sense. No, you keep saying makes no sense. I'm asking, would it be illegal? Would it be illegal for them to request it? Yes, it would be legal. It would not be elite. Well, it would be a breach of fiduciary duty of the employees themselves, because they're in council. There has to there has to be a duty. And you're mixing together three concepts, contract, tort and fiduciary duty. And that's where I'm having trouble understanding your argument. I read the undertaking between the tribe and Associated Pension Consultants. And it says that Associated Pension Consultants was an agent only with regard to ministerial nondiscretionary administrative services, as as set forth in the service agreement. And I don't understand why Associated Pension Consultants has any duty to look out for the interests of tribal members. The federal government has rules against top heavy plans. And I think you've conceded as you probably must that this was compliant with the federal rules. And it seems like that's all she wrote, if it's just ministerial services. But I think, well, Your Honor, I think the difference here is or the distinction is what APC did was not limited to ministerial and nondiscretionary activities. So let's take what occurred after May 1st. Well, I would. Yeah. But do me a favor. Ask before answer that question before May 1st. First, after May 1st, I had to have some separate questions. But what evidence is that they did anything but ministerial stuff before May 1st? Okay. So the complaint alleges, the complaint alleges that Moore came up with the idea of a pension plan. All right. And there is no way that the ringleaders themselves designed this pension plan. It has a number of complicated elements to it, which have the purpose and effect of very quickly transferring huge sums of the tribe's money in for the benefit of these these tribal officials. So while APC could have under the paper, under the agreement, taken simply ministerial activities and not engaged in active assistance of these of these individuals, it chose to take active assistance. It's not possible that anybody other than APC and Moore came up with this this pension plan. There's a way you seem to be. You seem to be keeping. You keep saying APC and more. I understand your contention that Moore designed the plan. Tell me what APC did before May 1st that wasn't just ministerial. So our legend, our allegation, Your Honor, is that APC and Moore together designed the plan. I know that's your allegation, but what what makes that plausible? What makes it plausible is so what do you think? So how this pension plan operated fundamental to it was an actuarial formula, which not actual formula was to was set up. And that's that was what determines how much money gets transferred. It was two hundred. It was set at two hundred and eight years, which is the pension leaders highest averaged three years of wages. Council, what specific tasks did APC undertake in setting up the pension plan? As we understand, they several of them, Your Honor, that went to the design of it, setting up that actuarial formula. Who did that? What's up? Who did who set up the actuarial formula? Was it APC or was it Moore? As we understand, it was APC and Moore working with heinous. So to be clear about the word of us, even though this case has been going on a long time, we're at a motion to dismiss. We have not teased out who came up with this, but we know, you know, the way you're talking, it would be drafted from scratch. But when I had some involvement with plans for small entities in my practice, it wasn't like that. For example, the way the American Bar Association Keogh plan worked is you'd send them a letter or give them a call saying you're interested. They'd send you a bunch of forms. The forms were the ones that they designed for anybody who got a Keogh plan with the American Bar Association. And you would just check a box. Do you want people to vest immediately upon hire after one year, after two years or after three years? It couldn't be more than after three years because of the federal top heavy regulations. And you'd send it back. And they never sent anyone to look over your office to see if you're covering everybody that ought to be covered. They never policed it in any way. They just process the forms and invested your money. And my impression is that that's the way most small plans work. Why would this one be different? Why this is different, your honor, is because we have allegations, detailed factual allegations, that an individual from ACC named Greg Lynn worked closely with Mr. Moore on this. So we see throughout the documents him being individually advising the ringleaders on a number of the components of these things. Now, so this was not a situation where this was an off-the-shelf pension, as your honor is describing. This was specifically designed by APC and Moore, in particular by a man named Greg Lynn, for the ringleaders for their benefit. So. But counsel, if it wasn't illegal, what's the problem with that? Well, the problem with that, your honor, to get back to my analogy that I was making at the beginning, is you have someone coming. They know it. You have some individuals who are coming to these service providers. These service providers know that they're establishing a government, a plan for a formula that is generally four times less generous than what these people are requesting. They also know, as a general matter, that these pension plans should be lasting for a long time. These individuals come to them and ask for, or are suggested by these individuals to put in themselves, a number of components to the plan that are unusual. This makes it so that those service providers know, or should know, that the people are using this for an improper purpose, because their client is not a business. Their client's a government. So is it your position that APC and Moore, in this case, should have said, sorry, we don't want your business? They could have done one of two things, your honor. Well, they could have done that. I'm asking whether they had a duty to say, I don't want your business. Yes. So somebody comes to and asks to set up a plan that's, let's assume that was all the idea of the ringleaders. They come and say, set up this plan. We want to set up this plan. We represent the tribe. Here's our authority. You know we're on the tribal council, etc. You should say, sorry, I won't do that, even though it's legal, because it's possible that you might later use this for a fraudulent purpose. Is that what you're saying? What I'm saying is that it's possible, your honor, that it's, that it should have either refrained or gone to the tribal council. Well, they have representatives of the tribal council in front of them. I mean, I don't want to do what Judge Kleinfeld did too much in terms of personal stuff. But when the president of a company and the chairman of the board come to you and ask you to do something legal, you generally don't say, I won't do it unless I can go back and talk to the entire board in person. Securities law may impose that kind of obligation, but common law doesn't, does it? Well, your honor, in this situation where you have one unelected official, you have one, sorry, one elected official among five who's coming to these service providers and saying, set up this incredibly generous pension for just myself and these four unelected folks, and put in all of these provisions that virtually guarantee that millions of dollars in three and a half years are going to be transferred for my benefit. It is a breach of duty for a competent retirement service provider not to say, this is inappropriate for this type of client. I need to take one step further at the very least to make sure that these people are not taking actions inappropriate and against their duties to my client before going forward. I know you want to save time for rebuttal, but I do want to ask you just a factual question about May 1st on. As I understand it on May 1st, the form to change trustees is sent to Mr. Moore, correct? Correct. Who promptly transmits it to ABC within the next five days. Mm-hmm. The plan says it won't be effect, the shortest period of time it can be to change trustees is 30 days unless the client says more, unless the client says I want it quicker. But the effective date, and this is where I'm getting lost in the record, is eventually made to be July 1. How does the effective date of July 1 come about? Right. So here's how it came about, Your Honor. And this is a situation where we did not know this when we drafted it. Yeah, I just want to know how it came about. Yeah. ABC's lens sat on the change of trustee requests for three weeks before going back to the tribe and telling the tribe that additional paperwork needed to be completed in order for change of trustees form to be correct. So that 30-day window that they allege there that says that they did nothing wrong, it doesn't account for the fact that they sat on that for three weeks before even coming to the tribe and saying other additional ministerial duties needed to be done. Okay. Now I have one other factual question. The money that was taken out of the plan, was it taken out outside that 30-day window or inside the 30-day window? It was taken outside. It was taken after July 1. After the change of trustees? After the change of trustees. Well, actually, that's not correct. It was, I apologize, Your Honor, the liquidation occurred right before the change of trustees. Okay. Thank you. Those are just factual questions. Thank you. That was the John stuff that needed to be taken care of. All right. Thank you, counsel. Thank you, Your Honor. Mr. Barnes? May I please record? This is Robert Shaughnessy. Oh, Ms. Barnes was listed to go first on the date sheet, but you're going first, Mr. Shaughnessy? Yes, we have talked before and I agreed that I would go first. So, and again, I'm here on behalf of Garth Moore Insurance and Financial Services, Inc. and Mr. Garth Moore. I'll refer to them collectively as Moore for the sake of simplicity. And like I said, we split the time. I'm going to take no more than 10 minutes and then pass the remaining time to Ms. Barnes. Because my time is limited, I wanted to focus on two issues. First, the lack of plausibility of the tribe's claim against Moore. And then, time permitting, I'd like to talk a little bit about why under the scarcity of the facts alleged against Moore, the policy considerations weigh against finding that Moore, as a financial advisor for the tribe's retirement plans, had a duty to the tribe to investigate and root out the alleged wrongful conduct of the employee defendant. Counsel, help me on paragraph 244 of the third amended complaint. The paragraph 244, that's page 60 of the third amended complaint, says that APC and Moore were aware of the requirement for tribal council authorization. And then it says that they followed the directions of the crooks in connection with the termination, quote, with the knowledge that the RICO ringleader's objective was to use the tribal pension to convert tribal money. Close quote. Is that enough of an allegation and a sufficiently plausible allegation so that we should assume knowledge for purposes of analysis? Your Honor, our position has been that that simply is a conclusion based on a very limited set of facts. I have trouble treating it as conclusory because it says they knew. They knew that the crooks were stealing. Well, there are no underlying facts establishing how it is that Moore ever knew what was going on at that time. Does the complaint or any of the record in front of us indicate what kind of authority the ringleaders, if you will, had when they came to Mr. Moore and said, we want you to help us set up a pension plan or 401k plan? Does the record indicate that they had a tribal council resolution or anything like that? Well, the allegation is that there was ostensible authority by the tribal leaders when they came to Moore. Well, I saw that in the complaint and I was trying to figure out whether that just meant they told them they had authority or there was something else to show. Again, yes, Your Honor, again, the allegations are that there were documents that bore the signature of tribal leaders with respect to the creation of the plan. Okay, that's what I was getting back. So the complaint, on the face of the complaint, when they came to Mr. Moore's, they had documents that apparently showed they had the authority to seek the design of a plan. Yes, and again, Moore's role in this was that Moore was approached about with questions from these employee defendants about setting up a retirement plan for the tribe. Moore, the allegation is that he suggested the idea of a retirement plan, but then it was APC that actually created the plan. So there's no more substantive allegation about what Moore did other than once the plans were in place, providing financial advice to the members who were there. There's just simply nothing other than conclusory allegations. Let me ask you about what you mean by conclusory. When I read you that paragraph in the third amended complaint, you said it was conclusory because it doesn't, and you said, if I understood you right, it says, yeah, it says APC and Moore knew that the crooks were converting the money when they were taking it out, but it's conclusory because it doesn't have facts to show how they knew. Now I'm thinking, if there's a contract complaint and it alleges that the defendant breached the contract, that's conclusory. The plaintiff has to say how the defendants breached the contract. But if there's a complaint that in a intersection collision, it says the allegation, then to say the defendant ran the red light, you don't need further pleading to say how you know it was a red light. How do you know the light was red? How do you distinguish red from the other colors? What exactly did you see and when were you looking? That would be specific enough to be a sufficient plausible allegation. I don't understand why too conclusory. Well, again, it goes back to the plans. There was nothing wrong with the plans that were in place. They were not illegal. They were appropriate. What the gravamen of the claim is, is that the compensation that the tribe was awarding to these employee defendants was so outrageous that somehow there was knowledge impliedly passed to more that this was for an illegal purpose. To put the matter differently, doesn't the complaint then flesh out why it says which is to say they should have had knowledge because of the way the plan was going to be designed. It doesn't allege that the crooks came to Mr. Moore and said we want to steal money from the tribe. Help us do it. It alleges that because of the kind of plan that was designed, he should have known they were going to steal money from the tribe. And I think the problem with that is what they're asking of Moore is to become the compensation police of the tribe when it's really the tribe that was responsible for overseeing the compensation package of the employee defendants. The very purpose of a retirement plan, whether it's a pension plan or a 401k, is to divert salary of an employee into a tax beneficial account. Help me on the termination. Help me on the termination. I want to get this question answered before your time runs out. I don't understand why it took from May to July in order to do the change of trustee documents and to terminate the ability of the crooks to take the notice by the first of June or beginning of June. From the allegations in the complaint, it's clear that for whatever reason, the termination date of the trustee was July 1. And the smoking gun exhibit that the complaint points the finger at Moore for, I mean, when you read that entire email exchange of June 30th, I think the district court was exactly correct when they said that the pleading itself is to bad faith by the appellants. And to quote the district court... Point me to the specific paragraphs. What I got out of it, and maybe I didn't read it carefully enough, was that the plan was entitled to 30 days notice. They got 30 days notice and they still didn't make the change. Well, if you look at the June 30 portion of the email... Hold on. Now, this is a motion to dismiss on the pleadings themselves. It's not summary judgment. So tell me what paragraph of the Third Amendment complaint to read. Well, I think the district court acknowledged that when the email itself was incorporated into the language of the complaint, it was appropriate to look at the email exchange. And I wanted to point this court to the final email in the chain. And excuse me, it's a July 1 email where Ms. Campos at Moore acknowledges to Greg Lynn that she had spoken with a new incoming trustee who was okay with the rollover of the account anyway. So to the extent that there's any kind of allegation that there was a delay in the removal of the trustee because that would otherwise damage the tribe, well, the incoming trustee was saying they were going to agree to the rollover anyway. So there's simply a lack of causation there. There's no evidence of wrongful conduct having otherwise occurred. So I see my time is running out. I think the issue here is if the court is going to find that there is a duty on the part of the organization, the burden that that's going to place on financial advisors, and I'm running out of time, is so great that it just simply for policy reasons, it just doesn't make sense to place that burden on financial advisors. When the individuals that had the ability to oversee the compensation of these individuals was the tribe members themselves. All right. Thank you, Judge, because you've got limited time. Can you start where your friend ended? Like Judge Kleinfeld, I want to understand what happened between May 1 and July 1. So let me tell you what I think I know, and you can tell me whether I'm wrong. Roughly on May 1, the tribe faxes over a change of trustee form, and within five days or so, Mr. Moore provides it to your client, APC. Correct? Correct. And it doesn't become effective until July 1. We know that. Correct. The policy itself says it can't be effective for 30 days. Tell us why the extra 20 days, in effect, or the extra 30 days, it took an extra 30 days for it to become effective. Well, I think what the complaint alleges is not that we did it outside the required time, but that we didn't do it quick enough. I think Stuart... Right. So that's what I want to get back to. The complaint alleges at that point, you knew or should have known that there was a controversy about whether or not, let's use the word bad guys, the bad guys were out to steal these withdrawals to occur, rollovers to occur at the beginning of July. If that's the theory of the complaint, why doesn't it at least plausibly state a negligence claim? Because we didn't have any obligation or right to act more quickly. We had to follow the plan documents, and so the plan required these forms that Mr. Gross was talking about, and then 30 days. Skinta could have come to us and said, we need it faster than the plan required. No, I'm sorry. You misunderstood my question. I'm not talking about faster than 30 days. I'm talking about how do you justify the roughly extra 30 days it took to get it done at a point in time where they allege you knew there was a problem? Well, I think I actually wouldn't justify it because I don't think that's an issue that's raised by the complaint. But if it's raised by your honor, it's justified by Mr. Gross, what he just said, that the proper forms were not prepared and submitted to APC. When APC went back to the tribe to get those, they still were not told to do it faster. So there was no reason to do it faster. It's not alleged. To go back to the point Mr. Shaughnessy ended on, and I understand the district court said because the complaint incorporates these emails, I can look at them as part of the complaint, which our law says. If you incorporate a document by about the new trustee saying, oh, it's okay, let these guys take their money. I think that what they imply, I don't know if they say this expressly, to be honest, is that the new trustee was going to allow it either way. So the new trustee was going to allow them to take their money and eventually didn't allow them to take their money. So it wouldn't have mattered. And where is that? Tell me where in the, I know it's not in the complaint, where in the email is that? Could email it incorporated by reference. Tell me where in the record that is. I don't have it. Okay, Mr. Gross probably knows. He'll tell me when we. Tell me, would it have been okay since no one told APC there was any rush if APC had taken six months to process the change of trustee? No, I don't think so. I think once the proper forms were submitted, they had to take 30 days under the plan. I mean, it's not, they didn't have to take 30 days. They were entitled to take 30 days. They weren't required to delay 30 days. They just couldn't be required to act faster than that, except in a special circumstance, as I recall the language. So why wouldn't six months be okay under your theory? Because the plan, as with all sort of red tape kind of things, requires that once we get a request, we act within 30 days. We received a forward from Garth Moore, reviewed it, and when we submitted it back to the tribe for their documentation, they returned it and we had to act on that. We could have sit on it for six months. Was July 1 within the 30 days after your firm was furnished with the proper documents? Correct. Well, APC, yes. Within 30 days after the proper documents. So APC, you're saying APC did act within 30 days of getting the proper documents? I'm saying based on the allegations and the complaint and what Mr. Gross just said, yes. Yeah, we're assuming the allegations of the complaint are true. Right. That's what I'm trying to find out here. Did they act? I think based on the allegations of the complaint, that issue is not raised. But based on what Mr. Gross said, yes, they did act within 30 days. The allegations are within that soon enough. So then if his argument is instead, and I may be making an argument, he's not making, but if his argument is instead that you took too long asking for the new document, you should have known there was some urgency from what you knew about the controversy at the time, but you processed this slowly, and had you done it more quickly, there would have been a different result. What's your response to that? We didn't know about the controversy at the time. Piscinta had the opportunity to tell us that. They didn't tell us that. They didn't tell us that as alleged in the complaint. They don't allege to have informed us about that. What they're saying is we should have known somehow. Do you have any response beyond what your colleague gave us to paragraph 244 that says APC did know? Yeah, I think that that issue was sort of discussed in Ashcroft. They talk about the individual who was arrested based on his race and ethnicity around 9-11, and how the director of the APC should have known that this was happening, and the court shut that down and said, no, that's a conclusion. There are no facts that support the idea that Mueller should have known this was happening to this person in this instance. You use common sense and context, and I think the context here do not support that APC had any knowledge of this. So when I read that, I guess I was thinking the director of the Department of Justice, the Attorney General of the United States, would know very little of what goes on because it's such a huge government department, and it did not occur to me to regard APC as comparable in the reasonable inference of ignorance. How would they know just because they're on the outside setting up a plan? How would they know that this was happening? There's no allegation that this plan was illegal, as your honors pointed out. There's no allegation that it was proper, just that it wasn't the best choice for an Indian tribe. This was the third amended complaint, right? And I think the judge had made clear before that that he was concerned about what allegations there were that would give rise to the reasonable inference that they had knowledge. And as I read the third amended complaint, and I think this is a fair reading, it's really that from the design of the plan, you should have known. You had constructive knowledge or effective knowledge. There's no allegation that anybody actually told them this was going to be done for nefarious purposes, right? Right, right. And our position is that's a stretch. There's nothing about the design of the plan that tells us that these employees or council members are going to embezzle money from the tribe. I mean, it tells us that they want to be able to change their mind about this plan, maybe. But is that uncommon? I don't know that. The complaint doesn't give us any reason why it shouldn't be acceptable. I mean, other than as it turned out, these employees allegedly use these plans to embezzle money. But there's no reason that APC or even Garth Moore would have known that in the beginning based on the allegations of the complaint. The IRS certainly didn't know that. There's no allegation that the IRS flagged these plans or their determination of the pension or anything else. So our position is not, maybe it's possible, but that's not the standard. It has to be more than possible. It's not possible that APC had any knowledge. I see the email is document 277, by the way. And that sort of issue of plausibility surrounds all of our arguments. I mean, there's no facts alleged that support that we had knowledge of this. There's no facts alleged that support the idea that APC had a duty and negligence or a fiduciary duty. I think your honor was right that the source document here, the agreement doesn't support either duty. And regardless, you know, we get into the issue of causation. We had these defendants allegedly acting as an intervening cause that prevented any liability from going to ABC. And I'm satisfied. Thank you, counsel. Rebuttal. Thank you, your honor. So first, I'd like to address this question of Ms. Campes' email on today. Also, I talked to Ambrosia yesterday, and she said Andrew Alejandre would sign the rollover request, just send it through her and it'll get done. So at the very best, all that email does is create an issue of fact on causation. So we don't have this is a motion for motion to dismiss and judgment on the pleadings. Well, who is, you represent Alejandre, or at least his interest, right? Yes. So who's Ambrosia? Yeah. So Ambrosia, Ambrosia is the tribal treasurer. So there's no allegation in the complaint that this is wrong, that this conversation never took place, is there? We don't, we don't allege anything about this, your honor. Well, but here, so you've got in your complaint incorporated by reference, a record that says we checked with the tribe and they said it was okay. Well, actually- Don't in your complaint say that didn't occur. To be clear, your honor, we do allege that we, that the tribe would not have approved any liquidation of these accounts. No, that's not, there's an express statement here that Mr. Alejandre said he would sign the rollover request. And you don't deny that that statement was made, do you? Well, I don't deny that this email exists. I, but I, there's no, we do not concede that Mr. Alejandre ever made that statement. But moreover, we certainly do not concede and we- Well, it's not a matter of conceding. Your complaint incorporates by reference an email where APC says we checked with the tribe. We're trying to get this done. We checked with the tribe and they said, don't worry, Mr. Alejandre will approve the rollover request. And having incorporated that email into your complaint, which you didn't have to, you don't ever say that's not true. That conversation never took place. We do not, your honor. That's, that's- Okay. But, but, but what I, but what I would say is, and the reason we don't refute it in the of different interpretations, because what was actually the rollover request, the rollover request being referenced was very likely Sherry Myers, which was approved in August before it was known that she was involved in any of the nefarious and criminal activity. I see that I'm out of time. If, if your honors have further questions, I'd be happy to address them. My time's going the opposite direction now. I'm not sure what that means. Thank you, counsel. That means you've exceeded your time. Thank you to both counsel. The cases just argued are submitted for decision by the court.
judges: Kleinfeld, Rawlinson, Hurwitz